## BARROW *v.* THE BANK OF LOUISIANA.

Where in a petition for an injunction to stay an order of seizure and sale. plaintiff acknowledges the existence of the mortgage on the land in controversy, but pleads prescription, and prays, as a third possessor of the land, that the mortgagee may be condemned to discuss other mortgaged property, he will not be allowed to amend his petition by declaring that the land had never been mortgaged. Such an amendment would be inconsistent with the previous pleadings and the party's own allegations.

A purchaser of property, subject to a mortgage duly recorded, and containing the *pact de non alienando,* stands, with regard to the mortgagee, in the position of the mortgagor, and can make no objection to a seizure and sale by the mortgagee which the mortgagor could not make.

The question whether the directors of a bank, which was authorised by its charter to lend money upon mortgage on lands only where they are in a state of cultivation, have exceeded their authority by making a loan upon unimproved property, is one which concerns the State and the stockholders only. Third persons cannot set up the objection, that the loan for which the mortgage was given, being on unimproved property, was illegal.

2b 453
44 338

HARVARD
LAW SCHOOL
LIBRARY.

BARROW
v.
BANK OF
LOUISIANA.

The statutes of 25 March, 1831, s. 3, and of 29 March, 1833, s. 3, are imperative, as to the con-
demnation of the plaintiff and surety to the payment of "interest at the rate of ten per
cent a year on the amount of the judgment," on the dissolution of an injunction arresting
the execution of a judgment. The court has no discretion as to the allowance of interest.

APPEAL from the District Court of West Feliciana, *Boyle*, J. *Paterson*,
for the plaintiff. *Bowman* and *Ratliff*, for the appellants. The judgment
of the court was pronounced by

SLIDELL, J. In the year 1836, the *Bank of Louisiana* took a mortgage
from one *Overbay*, upon a tract of land described as follows: " A certain tract
of land and plantation, situated in the parish aforesaid, in *Barker's* settlement,
on Dry bayou, containing 640 arpents, with the improvements thereon and
thereto belonging; bounded on the north by vacant lands, on the north-east and
east by lands belonging to *William Barker's* estate, vacant lands, and the estate
of *Joseph Young;* on the south-east and south, by vacant lands and Dry bayou;
and on the north-west by vacant lands; *being the same tract of land and planta-
tion on which Matthew Joiner lately resided.*" The mortgage contained the
pact *de non alienando.*

In 1838, *Overbay* sold this tract of land to one *Purl*, and in this deed the ven-
dor declared that the land was subject to the above mortgage to the *Bank of
Louisiana.* The date of the notarial act of mortgage was recited, and the
vendee reserved the right of applying his instalments of price to its payment.
In the same year *Purl* sold to *Varney*, by an act in which the purchaser waives
the mortgage certificate, required by the Code to be obtained by the notary.
The deed from *Overbay* describes the land as a tract of 640 acres, or there-
abouts, fronting on Dry bayou, &c.; the deed from *Purl* to *Varney* describes
it as a tract fronting on the river Mississippi, containing 640 acres, " being the
same bought by *Purl* of *Overbay.*"

In 1841, one *Slaughter*, upon an execution against *Varney*, caused to be
seized and advertised a tract of land described in the marshal's returns as,
" *Varney's* upper *Barker* place, adjoining the upper side of the *Young* place,
and containing 640 acres, or thereabouts, together with all the buildings and
improvements thereon." In the marshal's deed the land thus sold is described
as a certain tract or parcel of land containing 640 acres, or thereabouts, lying
and being situated in that part of the parish of West Feliciana, known as *Bar-
ker's* settlement, and bounded as follows: " On the upper or north side, by va-
cant lands, or lands belonging to *Wm. D. Ray;* on the east side, by vacant
lands; on the lower or south-east corner, by the lands formerly owned by
*Robert Young*, deceased, and known as the *Young* place, fronting on Dry
bayou, and lying near the Mississippi river."

*Joiner* died before the mortgage was given to the bank. The tract of land on
which he once lived fronted on the Mississippi, and was quite dissimilar in form
and boundaries to the property in question. The accuracy and correctness, in
the main, of the boundaries set forth in the bank's mortgage, as compared with
those of the land claimed by the plaintiff, are not questioned by the plaintiff,
and the evidence in the case satisfies us that *Overbay* mortgaged, and that the
plaintiff bought, the same tract.

The principal argument advanced by the plaintiff, to sustain the injunction
taken out by him to restrain the order of seizure by which the bank attempted
to enforce its mortgage, is founded on an alleged misdescription in the act of
mortgage, to wit, that the land is described as the same tract of land, or plan-

tation, on which *Matthew Joiner* lately resided; whereas the evidence adduced at the trial shows, that *Joiner* never resided on this tract, but on another tract about a mile and a half distant; that the land was not in cultivation when mortgaged by *Overbay* ; and that one of the boundaries is erroneously stated to be the lands of *William Barker*.

What might be the effect of these variances as against a subsequent *bona fide* purchaser, under other circumstances than those presented in this controversy, it is unnecessary now to consider ; the plaintiff is completely estopped, by his own petition, from raising any such objections. The petition formally recites his chain of title, as above stated, from *Overbay*, *Purl*, and the marshal's sale, giving the dates of the several notarial acts and marshal's deed, thus identifying the lands as the same mortgaged to the defendants; declares that they have been seized at the suit of the bank ; pleads prescription of the bank's claim ; asserts himself to be a third possessor as regards the bank; declares that, besides the mortgage of the land so seized, the bank has also a mortgage upon certain slaves, which it should first discuss, and to which discussion he, as a third possessor, is entitled. There is not only no denial that the bank had a mortgage on the land seized, but a substantial averment that it had such mortgage ; nor is there an approach to an averment that *Barrow*, when he bought, was ignorant of the bank's mortgage.

This petition, so far as the bank's original right of mortgage was concerned, should have been dismissed on the party's own showing. In fact the only possible pretext for an injunction, upon the face of the petition, was the charge of prescription, and the claim of discussion, which we will hereafter consider.

This petition was filed, and an order of injunction obtained, in December, 1844, but not served on the bank till March, 1845, up to which time the cashier, upon whom it was served, deposes, that he had no knowledge of the order of injunction. After obtaining the order, the plaintiff had a conversation with the cashier, in which he urged him to have the negroes sold, and on frequent occasions told him that he would pay the bank's debt, if the negroes were sold. The reason assigned by *Barrow* was, that the negroes might be carried off; an apprehension which, it appears, was subsequently realised ; the bank, however, declined to enforce a sale of the slaves.

On the 9th of December, 1845, being about one year after the original petition for the injunction was filed, after issue had been joined and the cause fixed for trial, the plaintiff obtained leave, notwithstanding the opposition of the defendants, to file an amended petition, in which he avers that the land seized had never been mortgaged to the bank, and that he had not discovered this fact until the previous day. This amendment should not have been permitted. It was utterly inconsistent with the previous pleadings, and the party's own allegations.

The party, being fully estopped by his own judicial acknowledgments from disputing the original validity of the mortgage to the bank, it remains to consider the effect of the refusal and neglect of the bank to enforce its mortgage upon the slaves. The bank held a mortgage, with a pact *de non alienando*. By reason of this fact, duly recorded, *Barrow* stands in no better position than did the original mortgagor. *Overbay* could not dictate to the bank the prior enforcement of its mortgage, by the sale of the slaves; much less avail himself of the fraudulent withdrawal of that portion of the mortgage property. *Barrow*, claiming title through *Overbay*, is precluded by this fact from raising any such objection.

BARROW
v.
BANK OF
LOUISIANA.

See *Donaldson* v. *Maurin*, 1 La. 39. *Nicolet* v. *Moreau*, 13 La. 315. *Murphy* v. *Jundot*, 2 Rob. 379. The plaintiff could have acquired a recourse upon the slaves, by paying the bank, and thus obtaining a subrogation.

That the bank was required by its charter to loan upon mortgage of improved lands, is an objection which the plaintiff is not permitted to raise. It is a question of duty, which concerns the State and the stockholders. The plea of prescription is not tenable under the evidence.

Under the imperative terms of the acts of 1831 and 1833, we are obliged to grant the defendants in injunction, interest; but considering the indifference they have exhibited with regard to the prompt enforcement of their rights, we shall exercise the discretion permitted by the statute, and refuse damages.

It is therefore decreed that the judgment of the court below be reversed; that the injunction be dissolved, and the defendants permitted to proceed in the execution of the order of seizure and sale; and it is further decreed that the defendants recover of the plaintiff, and of *David Barrow*, his surety in injunction, the sum of $1,015 13, as interest on the amount of the judgment enjoined, from the date of service of the injunction till the dissolution thereof, this day; and that the plaintiff pay the costs in both courts.